IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL S. MONTELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 04-874 |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) |
| Defendant. | ) |

MEMORANDUM ORDER

CONTI, District Judge

*Introduction*

This is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Paul S. Montell ("plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 423, *et seq.,* and Supplemental Social Security ("SSI") under Title XVI of the SSA, 42 U.S.C. §§ 1381, *et seq*.  Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence and that the case should be remanded for the ALJ to consider properly all the evidence as presented.  Defendant asserts that the decision of the ALJ is supported by substantial evidence.  The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  The court will deny plaintiff's motion and grant defendant's motion to summary because the decision of the ALJ is supported by substantial evidence.

*Procedural History*

Plaintiff as March 1, 1993, was found to be disabled within the meaning of the SSA. Because he subsequently engaged in substantial gainful activity, those benefits ceased as of November 1998 pursuant to a determination of an administrative law judge in a decision dated March 22, 2000.  (Record ("R.") at 59-60.)  Plaintiff reapplied for benefits on January 25, 2002. (R. at 78-80.)  That application for benefits was denied in an initial determination on May 29, 2002 (R. at 66-69) and he did not seek appeal.  Plaintiff filed the application at issue in this appeal on a protective basis on November 21, 2002 asserting a disability since February 1, 2001 by reason of diabetes, depression and cognitive disorders.  (R. at 129, 81-83, 310-12.)  He was denied at the initial level (R. at 35-55) and then filed a request for a hearing.  (R. 70-74, 314-17.) On July 17, 2003 a hearing was held before the ALJ.  Plaintiff appeared at the hearing and testified.  (R. at 40-54.)  Plaintiff was represented by an attorney at the hearing (R. at 37.)   In a decision dated October 22, 2003, the ALJ determined that plaintiff was not disabled and, therefore, not entitled to benefits.  (R. at 13-19.)  Plaintiff timely requested a review of that determination and by letter dated April 28, 2004 the Appeals Council denied the request for review.  (R. at 5-7.)  Plaintiff subsequently commenced the present action seeking judicial review.

*Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as

a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Burnhart, 312 F. 3d 113, 118 (3d Cir. 2003).  This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder.  Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### *Plaintiff's Background and Medical Evidence*

Plaintiff at the time of the hearing before the ALJ was 28 years old.  (R. at 40.)  Plaintiff's father reported that plaintiff was brain damaged at birth and became diabetic at the age of 13.  (R. at 98.)  Plaintiff attended a special education school for eight years and then was mainstreamed into high school, from which he graduated and where he attended a special education program with some regular classes.  (R. at 40, 155.)  With respect to activities of daily living plaintiff assists his parents with routine household chores, does dishes, and empties the garbage.  (R. at 48.)  He goes to the grocery store and to the mall.  (R. at 49.)  He also goes to restaurants and belongs to the American Legion, the Fraternal Order of Eagles and the Slovak Catholic Sokol Club.  (Id.; R. at 129.)  Plaintiff was assisted in completing his application form by his father.  (R. at 98-99.)

With respect to his work history, plaintiff was employed by the United States Postal Service as a casual clerk and casual mail handler for approximately one month.  (R. at 41.)  He was laid off from that job, but noted that "I can do the job, but I got laid off because they were

laying off all casuals." (R. at 44.) He also had a job working as a security guard. That job lasted for approximately two years. (R. at 41.) Plaintiff acknowledged that he was not fired from that security guard position, but rather was laid off. Plaintiff stated: "I got laid off from that, too, because they were shutting down the plant that I was working at–." (R. at 45.) He also noted that "[t]hey were laying off mostly everyone who – all the security officers who worked at the plant." (Id.) Any other work positions he had were short term, such as working special events at a ball park where he was let go because plaintiff was not capable of "focusing on the crowd of people that I was watching." (R. at 13-14.) His last job was as a security officer where he did rounds and sat at a desk. He was not able to handle that job because it was not like his prior security guard position where he only did a round every two hours or so. (R. at 51.) He also worked doing security screening at the airport, but he was not able to keep up with the pace. (R. at 52.) After he was laid off from his two year employment as a security guard, he could not maintain consistent employment because he was being told that he was not "performing up to our standards and we're going to have to let you go." (R. at 51.)

       The medical evidence of record consists of records from several health care professionals. The records of plaintiff's psychiatrist, Dr. Rodney S. Altman, D.O., mainly consists of treatment notes from 1994 through November 6, 2000. (R. at 163-213.) There is also a note written by Dr. Altman on January 9, 2002 on a script form which provides, without explanation: "Mr. Montell is unable to be gainfully employed on a consistent basis due to medical illness and this is a chronic condition." (R. at 162.) There are no treatment notes from Dr. Altman from November 6, 2000 through July 17, 2003, the date of the hearing. The treatment note from November 6, 2000 is a typed form which does not contain any notes or checks with respect to an indication of

plaintiff's mental or physical condition.  (R. at 163.)  The last treatment note in the record from Dr. Altman that contains any medical information is dated September 27, 2000 and reflects an assessment that plaintiff is stable with his depression, his ADHD is stable with medications and that the plan was for him to continue his medication as routine.  (R. at 164.)  The other plan notes for treatment are not readable.  (Id.)

On March 6, 2000, Ira E. Baumgartel, M.D., examined plaintiff.  (R. at 214.)  He noted: "[Plaintiff] has had some depression off and on.  He does take Zoloft which keeps his mood fairly stable...."  (R. at 215.)  With respect to plaintiff's depression Dr. Baumgartel noted as an impression: "Depression with suspected attention deficit disorder for which he takes Zoloft and Ritalin.  This may enter into be [sic] more of a issue in this gentlemen's difficulty to maintain activities.  I would recommend further psychological evaluation to delve into that."  Id.

On April 3, 2002, plaintiff was examined by T. David Newman, DRS, a licensed psychologist.  (R. at 217.)  Dr. Newman noted plaintiff had "no history of psychiatric inpatient hospitalization [and] . . . does not report any outpatient psychotherapy."  (R. at 217.)  He noted that plaintiff has diabetes.[1]  (R. at 218.)  With respect to plaintiff's mental status, Dr. Newman noted that plaintiff denied any problems with appetite, sleep or suicidal ideation.  (Id.)  He had "no history of perceptual disturbances."  (Id.)  Dr. Newman found plaintiff to be oriented in all spheres and sensorium appears clear.  (R. at 219.)  Dr. Newman reported test results from the Wechsler Adult Intelligence Scale – Third Edition, which yielded a verbal IQ score of 85 (low

---

[1]At the hearing, plaintiff's counsel advised the ALJ that plaintiff's diabetes was not an issue.  Plaintiff's attorney stated:  "We're strictly here on the basis of the psychological reports." (R. at 39).

average) and performance scale of 80 (low average). (<u>Id.</u> at 219-20.) Plaintiff's full scale IQ score was 81 (beginning of low average). (R. at 220.) Dr. Newman found:

> Mr. Montell does not demonstrate a significant difficulty understanding and retaining instructions to perform simple, repetitive tasks. He would not be anticipated to have significant difficulty relating to supervisors. It is possible that co-workers might perceive his less than average level of social perception and this might cause some difficulties. It is unlikely that he will be able to tolerate the stress and pressures associated with day-to-day activities that would involve significant social components. His medication seems to be working quite adequately with respect to managing any symptoms he might have regarding difficulty focusing attention (and he does not present any significant aspects of depression at this time).

(R. at 220.) Dr. Newman diagnosed plaintiff with Cognitive Disorder NOS. (<u>Id.</u>)

Dr. Newman also filled out a checklist with respect to plaintiff's ability to adjust to a job. (R. at 222-23.) With respect to making occupational adjustments, he found plaintiff had unlimited to very good ability to interact with supervisors; somewhere between unlimited/very good to good ability in maintaining attention/concentration; good ability at following work rules using judgment dealing with work stressors, functioning independently; between good to fair ability with respect to dealing with the public; and fair ability with relating to co-workers. (R. at 222.) There were no indications of poor/none abilities with regard to making occupational adjustments. With respect to category "Making performance adjustments," Dr. Newman found plaintiff had a fair ability to understand, remember and carry out complex job instructions; had somewhere between to good to fair ability to understand, remember and carry out detail but not complex job instructions; and had unlimited/very good ability to understand, remember and carry out simple job instructions. (<u>Id.</u>) With respect to the category "Making personal-social adjustments," Dr. Newman found plaintiff had unlimited to very good ability to maintain

personal appearance; somewhere between unlimited/very good to good ability to behave in an emotionally stable manner; and had good ability to relate predictably in social situations and demonstrate reliability. (R. at 223.) He noted no other work related activities affected by the impairment. (Id.)

On May 10, 2002, Sanford Golin, PhD., completed a Mental Residual Functional Capacity Assessment with respect to plaintiff. (R. at 224-43.) In that assessment the consultant reviewed the records prepared by Dr. Newman, Dr. Baumgartel and Dr. Altman. (R. at 226.) He did not find plaintiff to be marketably limited in any category. (R. at 224-25.) He found plaintiff to be moderately limited with respect to eight abilities and the remaining abilities were indicated as not being significantly limited. (Id.) The abilities checked as moderately limited were the abilities to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to complete a normal work day and work week without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others in the functional capacity assessment. (Id.)

Dr. Golin gave great weight to the opinion of Dr. Newman, including his opinion that plaintiff had unlimited ability to carry out simple tasks. (R. at 226.) Dr. Golin gave great weight to Dr. Baumgartel's opinion, who noted that plaintiff's depression and ADHD were stable with medications. (Id.) He also gave great weight to Dr. Altman's diagnosis of, among other things, a GAF in the range of 70 to 80. (Id.) Dr. Golin concluded that plaintiff was able to engage in

competitive employment. (Id.) On a psychiatric review technique form dated May 10, 2002 (R. at 228-241) Dr. Golin noted that the categories for which medical disposition was based for plaintiff included 12.02 organic mental disorders and 12.04a effective disorders. (R. at 228.) Dr. Golin noted that the allegation of disability was partially credible. (R. at 240.)

The record contains the treatment notes of James S. Meditch, M.D., plaintiff's primary care physician. (R. at 161-66.) The treatment notes are for four visits. (Id.) The first visit reflected in the record occurred on October 2, 2000. (R. at 265.) In the treatment notes for that visit Dr. Meditch noted that plaintiff's reason for the medical visit was to obtain a physical for weapons use. (Id.) At that examination plaintiff reported no history of mental problems. (Id.) Dr. Meditch noted, however, that plaintiff "is somewhat evasive and a very difficult historian. He often answers questions indirectly and occasionally inappropriately. There are times when it seems as though he might become hostile, but is not in the least bit combative." (Id.)

Plaintiff's second visit to Dr. Meditch reflected in the records occurred on February 20, 2002. (R. at 264.) Dr. Meditch noted that the plaintiff was returning for the visit because of his follow-up with respect to diabetes. (Id.) He noted that plaintiff had a psychiatric diagnosis and was taking Ritalin and Zoloft as prescribed by Dr. Altman. (Id.) He commented that plaintiff had an unknown disorder and Dr. Meditch referred plaintiff to Dr. Altman for evaluation. (Id.) He concluded: "His affect seems somewhat unusual and occasionally defensive." (Id.) The third visit reflected in the record occurred on August 21, 2002. (R. at 263.) Plaintiff was again seeing Dr. Meditch for his diabetes and also for a mood disorder. (Id.) Dr. Meditch noted that plaintiff "has a history of mild developmental disorder and takes Zoloft 100 mg a day and Ritalin 20 mg qAM for it." (Id.) With respect to plaintiff's mental issues, Dr. Meditch reported the

following impressions: that plaintiff had a mood disorder, continue Zoloft and Ritalin, and a mild developmental disorder, to continue Ritalin. (Id.)

Plaintiff's final visit to Dr. Meditch reflected in the record occurred on November 15, 2002. (R. at 262.) Plaintiff's visit to Dr. Meditch on that day was for his diabetes and hyperlipodemia. (Id.) Dr. Meditch with respect to plaintiff's mental issues reported: "Depression. Use Zoloft 100 mg a day with fairly good control." (Id.) He also noted plaintiff's attention deficit order and developmental disorder and for plaintiff to continue Ritalin. (Id.) The final impression was:

> Disability. The patient is attempting to get on Social Security disability. I asked him about reasoning and he believes it is for depression. He could not clearly articulate why he wants to get on disability although clearly requires medications to work. Forms were completed for him although his indication for disability is not terribly convincing.

(Id.)

On January 30, 2003, Douglas Schiller, PhD., completed a form Psychiatric Review Technique for plaintiff. (R. at 269-82.) On that form Dr. Schiller essentially just checked boxes and had some cryptic notes with respect to plaintiff's being mentally handicapped and having ADD. (R. at 281.) He also noted Dr. Newman's diagnosis. (Id.) On the boxes checked Dr. Schiller reflected that plaintiff's mental impairments were not severe. With respect to the functional limitations, the boxes checked were all for mild limitations with respect to the restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. (R. at 279.)

By letter dated March 13, 2003, Dr. Meditch wrote to plaintiff's counsel and stated with respect to plaintiff's mental impairment that:

9

> Mr. Montell has an unknown psychiatric disorder, which he has had since I met him in October 2000. He has done well with Zoloft and Ritalin and I have not altered his regiment. It would probably help his social security determination if he would have a formal psychiatric consultation.

(R. at 291.) Plaintiff subsequently underwent a formal psychiatric consultation with Dr. Lawrence B. Haddad, PhD., a psychologist, on April 29, 2003. (R. at 297.) The psychological exam involved a clinical interview, the Shippley vocabulary test, cognitive capacity screening exam, Bender-Gestalt visual motor task, Rey auditory-verbal learning test, neuropsychological symptom checklist and the Minnesota multi-phasic personality inventory 2 (MMPI). (Id.) Dr. Haddad also reviewed a report from Dr. Newman. (Id.) With respect to the mental status of plaintiff, Dr. Haddad noted that, among other things, plaintiff's mood was "okay" and that plaintiff had no signs of florid psychosis. (R. at 298.) He noted, however, an "element of personalized reference and hyper-vigilance." (Id.) He summarized:

> [T]his case is more complex, as there are interacting factors which converge to seriously compromise his functional capacity. Sub-cortical damage with attention, shifting and focusing difficulties cause him to be easily distracted and make it difficult for him to keep on task. This is a powerful stressor that influences depression, fears, worries and anxieties and exacerbates his self-perceptions of cognitive ineffectiveness.

(R. at 298-99.) He noted that:

> With regard to Mr. Montell's vocational functioning, he has been unable to sustain any significant work involvement in even rather basic, structured employment situations. Medication allows him to function in a controlled, one-on-one situation, however historically he responds poorly in anything less than a highly directed situation.

(R. at 299.) He opined that plaintiff could not sustain a work pace without constant supervision and that stresses of work would exacerbate his "impaired emotional functioning." (Id.) He

10

found that plaintiff was "significantly impaired, both cognitively and emotionally, and could not participate in any substantial gainful employment." (R. at 297-301.)

In a checklist form completed by Dr. Haddad entitled "Medical Opinion Re: Ability To Do Work-Related Activities (Mental)," completed on May 7, 2003, (R. at 300-01), Dr. Haddad found plaintiff had poor or none mental abilities and aptitudes to do unskilled work in sustaining an ordinary routine without special supervision, in completing a work day and week without interruptions from psychologically based symptoms, and in dealing with normal work stress. (R. at 300.) With respect to semi-skilled and skilled work, he found plaintiff had poor or none abilities to understand and remember detailed instructions, to carry out detailed instructions and to deal with stresses of semi-skilled and skilled work. (R. at 301.) Dr. Haddad also indicated that on average he anticipated plaintiff's impairments or treatment would cause plaintiff to be absent more than three times a month from work. (R. at 301.)

## *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy" 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. § 416.920. The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d. Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the ALJ may find that the plaintiff is not disabled. Burns v. Burnhart, 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability in February 2001; (2) plaintiff suffers from mental impairments, which are severe; (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff retained the residual functional capacity to perform his past relevant work; and (5) even if plaintiff could not perform his past relevant work, there were jobs in the national economy that plaintiff could perform. (R. at 14-15, 18-20.)

Plaintiff asserts two arguments to support his position that the ALJ erred in determining that he could perform his past relevant work. First, plaintiff argues that the ALJ erred in not

affording appropriate weight to the opinions of plaintiff's psychiatrist, Dr. Altman, his primary care physician, Dr. Meditch, and the independent medical examiner, Dr. Haddad. Second, plaintiff argues that the ALJ erred in determining that plaintiff could perform his past relevant work because the ALJ did not properly explain the evidence when making the determination concerning residual functional capacity for past work. Defendant contends that the ALJ's decision is supported by substantial evidence. Each of plaintiff's arguments will be discussed.

### 1. Weight given to opinions of plaintiff's treating physicians and an examining physician

Essentially plaintiff is arguing that the ALJ erred in determining that plaintiff did not meet his burden to establish that he was incapable of performing his past relevant work. See Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) ("claimant bears the burden of establishing that he or she is incapable of performing his or her past relevant work due to a physical or mental impairment"). In making disability determinations, an administrative law judge has a duty to consider the opinions of treating physicians and to give them substantial weight. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

Even if a treating physician bases his medical judgment upon a plaintiff's subjective complaints, the administrative law judge can only reject the treating physician's medical opinion if there is contradictory medical evidence. Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988) (reversing an administrative law judge who rejected the plaintiff's medically credited symptomatology and instead relied upon his own observations of the plaintiff and the plaintiff's

testimony that he could perform limited household chores).  Essentially, an administrative law judge is required to review all the evidence presented and explain why he rejects probative conflicting evidence.  See Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

A treating physician's opinion on the issue of whether a claimant is unable to work, however, does not bind the Commissioner – that decision is solely the responsibility of the administrative law judge.  20 C.F.R. § 416.927(e)(1)-(3).  Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (treating physician's opinion that claimant is disabled or unable to work is not dispositive).  Also, when a physician's opinion is inconsistent or unsupported by the record, the administrative law judge may give that opinion less weight.  20 C.F.R. § 416.927(d)(3),(4).

The ALJ in his decision reviewed the medical records and confirmed that plaintiff had severe mental impairments, but concluded that those impairments only resulted in mild restrictions.  (R. at 15.)  The ALJ also did not find plaintiff's allegations with respect to the severity of "his symptoms and functional limitations to be entirely credible." (Id.)  He concluded that plaintiff had the residual functional capacity to work at simple repetitive tasks so long as he was not under high quality or quota standard pressures or did not have extensive interaction with the public.  (R. at 15.)  The ALJ commented on the consultative examination by Dr. Newman and gave his opinions greater weight than the opinion of Dr. Haddad.  (R. at 16.) The ALJ correctly noted that the conclusion of Dr. Haddad with respect to plaintiff's inability to perform any substantial gainful activity is a decision that is the function of the administrative law judge and, therefore, that opinion is not entitled to weight unless it is supported by the medical findings.  20 C.F.R. § 416.927(e)(1),(3); Adorno, 40 F.3d at 47-48.  The ALJ noted that Dr. Haddad's objective findings were consistent with plaintiff's ability to perform the mental

demands of simple repetitive work and that Dr. Haddad did not comment on plaintiff's work history, which included his employment as a security guard for two years and his job in the postal service – positions which he was able to maintain and perform the work.

With respect to Dr. Altman's January 9, 2002 notation that plaintiff is unable to be gainfully employed on a consistent basis, the ALJ found that conclusion was not supported by the objective evidence. (R. at 16.) Specifically, the ALJ noted Dr. Altman's treatment notes reflect that plaintiff's mental symptoms were adequately controlled with medication. (Id.) This court notes the last examination of plaintiff by Dr. Altman for which treatment notes were prepared and that is included in the record was on September 27, 2000, more than a year prior to the brief notation provided by Dr. Altman on January 9, 2002. In addition, Dr. Altman's conclusion is within the province of the administrative law judge. 20 C.F.R. § 416.927(e)(1)-(3).

The ALJ explained that little weight was given to Dr. Meditch's opinion to the Department of Public Welfare with respect to plaintiff being permanently disabled (R. at 295) because Dr. Meditch treats plaintiff primarily for diabetes and hyperlipodemia and also in an office note dated November 15, 2002, Dr. Meditch acknowledged that the indication of disability for plaintiff was not "terribly convincing." (R. at 17.)

Reviewing the record as a whole including the medical evidence and the ALJ's stated reasoning for assigning the weight he gave to the various opinions of the medical professionals, there is substantial evidence to support the weight given by the ALJ to the opinions of Dr. Altman, Dr. Meditch and Dr. Haddad.

    **2.**    **Ability to Perform Past Relevant Work**

With respect to past relevant work, the regulations provide:

> Work you have already been able to do shows the kind of work that you may be expected to do. We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.

20 C.F.R. § 404.1565(a). Plaintiff worked as a security guard from July, 1999 until February, 2001 (R. at 92) which is within 15 years of the time of the determination, he worked long enough to learn the job and it was substantial gainful activity. That job, therefore, may properly be considered past relevant work.

> The claimant is the primary source for vocational documentation, and <u>statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work</u>.

SSR No. 82-62 (C.E. 1982) (emphasis added). In making the determination of plaintff's residual functional capacity, the ALJ referred to Mr. Montell's own testimony that reflected that he was able to perform work as a security guard on a full time basis for two years and that he lost that position due to being laid off rather than an inability to perform the work. (R. at 17.) Here, on the record before the ALJ, plaintiff's own statements are sufficient for making the determination especially given the ALJ's findings regarding the weight to be given to the various health care professional's opinions.

The ALJ also noted Dr. Newman's consultative report, and determined that Mr. Montell was able to perform simple, repetitive work not requiring high quality or quota standards or extensive interaction with the public and that there were no exertional limitations. (R. at 17.) In light of those findings, the ALJ concluded that plaintiff retained the residual functional capacity to perform past relevant work and, therefore, was not disabled. Based upon a review of the record as a whole, there is substantial evidence to support the ALJ's determination that the

plaintiff failed to meet his burden of proof with respect to step four of the sequential evaluation.[2]

*Conclusion*

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that plaintiff is not disabled. The decision of the ALJ denying plaintiff's application for SSI and DIB is affirmed. Therefore, plaintiff's motion for summary judgment (Docket No.6) is **DENIED**, and defendant's motion for summary judgment (Docket No. 8) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Paul S. Montell.

---

[2] In the alternative, the ALJ determined with respect to step five of the sequential evaluation that plaintiff would be able to perform substantial numbers of jobs in the national economy at all exertional levels and reached that conclusion using section 204 of the medical-vocational guidelines. (R. at 19.) In light of the finding that there is substantial evidence of record to support the ALJ's determination that plaintiff did not meet his burden to establish his inability to perform his past relevant work at step four of the sequential evaluation analysis, this court need not address whether the ALJ erred in the findings with respect to step five of the sequential evaluation, i.e., that there are significant numbers of jobs in the national economy that plaintiff could perform. If the court had to reach that step in the analysis, the matter would have been reversed and remanded because the medical-vocational guidelines cannot be relied upon when there are non-exertional impairments. The administrative law judge when there are non-exertional impairments is not entitled to rely solely on the grids and must take vocational expert evidence to determine a claimant's residual functional capacity. Miller v. Callahan, 964 F.Supp. 939 (D. Md. 1997) (failure to take vocational expert testimony is reversible error). In Sykes v. Apfel, 228 F.3d 259 (3d Cir. 2000), the court of appeals found that the Commissioner cannot meet the burden of proof at step five of the analysis by relying on grids when a non-exertional impairment exists. The court of appeals also held that the commissioner could not meet its burden in step five by using the grids only as a "framework." Id. at 274.

The clerk shall mark this case as closed.

                                                  By the court:


                                                  /s/ Joy Flowers Conti
                                                  Joy Flowers Conti
                                                  United States District Judge

Dated: September 30, 2005

cc: counsel of record